## IN THE SUPREME COURT OF MISSISSIPPI

### NO. 93-CT-01365-SCT

*JAMES H. DONALD AND BARBARA LINDSAY DONALD*

*v.*

*TRIPLE S WELL SERVICE, INC.*

### ON PETITION FOR WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 11/08/93 |
| TRIAL JUDGE: | HON. R. I. PRICHARD, III |
| COURT FROM WHICH APPEALED: | JEFFERSON DAVIS COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANTS: | JAMES KENNETH WETZEL |
| ATTORNEY FOR APPELLEE: | RICHARD F. YARBROUGH, JR. |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | REVERSED AND REMANDED - 3/12/98 |
| MOTION FOR REHEARING FILED: | 3/25/98 |
| MANDATE ISSUED: | 5/27/98 |

**EN BANC.**

**BANKS, JUSTICE, FOR THE COURT:**

¶1. In this case we determine whether the introduction of evidence of alcohol use, where that evidence is ultimately found to be insufficient to create a viable issue as to any fact to be tried, is such error as to dictate reversal. We conclude that under some circumstances it is and that the judgment here must be reversed.

### I.

¶2. On March 3, 1992, James H. Donald and Barbara Lindsay Donald filed a complaint against Apache Corporation and Triple S Well Service, Inc. The Donalds allege that Mr. Donald sustained personal injuries in two unrelated incidents, the first on August 1, 1989 and the second on July 9, 1990. Mr. Donald claimed he was injured while working on two different well sites owned by Apache in Jefferson Davis County, Mississippi. Apache had contracted with Triple S to provide work over services at both well sites. In his complaint, Donald asserted that Apache, as owner of the wells, and Triple S, as owner of the work over rigs, were liable for his injuries due to failure to provide him a safe place to work and for failing to provide drilling equipment in a safe condition.

¶3. The Donalds negotiated a settlement with Apache immediately prior to trial. Thereafter, a five day trial ensued against the remaining defendant, Triple S. On November 5, 1993, the jury returned a verdict in favor of Triple S. The Court of Appeals affirmed the jury verdict and judgment of the trial court. The Donalds then filed a petition for rehearing which was denied by the Court of Appeals.

¶4. In their petition for certiorari, the Donalds present two issues for review by this Court: (1) whether the lower court erred in denying their motion in limine to exclude evidence relating to alleged alcohol use by Mr. Donald on the job prior to the injuries in question, and (2) whether the lower court erred in granting assumption of the risk instructions to Triple S. We granted certiorari on both issues.

## II.

¶5. James H. Donald, at the time of the injuries alleged in this litigation, was working at certain gas well drilling sites in Jefferson County owned by Apache Corporation. He had worked in the field for forty years, and testimony at trial was unanimous that Donald was an excellent worker who "knew how to get the job done." Donald's employer, Homco, Inc., had contracted to assist Apache in performing a "work over" of two existing wells. This work consisted of removing and replacing deteriorated piping in the well in order to improve its performance. A special work over rig was required for such work, and Apache had contracted with Triple S to provide the equipment and personnel to assist in the operation of the rig.

¶6. Donald's position involved special skills and was known in the trade as a "fishing tool operator." The process of reworking a well involves lowering a cutting tool into the well, cutting loose lengths of the existing piping, then extricating the severed section along with any obstructions that may have accumulated. The process continues until all deteriorated piping is removed and new piping inserted. The fishing tool operator's duties include supervising the lowering of the cutting tool, operating the tool once it is lowered into the well, and removing the pipe and obstructions. Much of the actual physical labor involved in handling the old sections of pipe, once they are returned to the surface, is performed by manual laborers referred to as "floor hands." The actual lowering of the fishing tools and the removal of the old piping is accomplished by a motor-operated drilling apparatus controlled by a throttle, a clutch, and a lever-operated braking mechanism.

¶7. Once an older section of pipe is removed from the well, the lower end of the pipe is guided to a slide mechanism by the floor hands. The driller then lowers the upper end of the pipe, thereby pushing the lower end along the slide until the pipe section is flat on the slide. It is then detached from the drilling rig and manipulated onto an adjoining pipe rack by the floor hands so that the process can begin again.

¶8. Donald's first alleged injury occurred August 1, 1989. On that occasion, Donald claims that during the process of laying down a section of old pipe just removed from the well, the lower end broke through the slide and became lodged. The two floor hands were attempting to manipulate the lower end of the pipe back onto the sliding mechanism so that the lowering process could be resumed, but were encountering difficulties. Donald decided to assist in the process and the three of them were successful in manipulating the lower end of the pipe onto a track where it would continue to slide away from the rig as the upper end descended. In the process, however, Donald claims that

he slipped and fell, injuring his back. He alleges that the area around the pipe slide was muddy and slippery, and that this condition caused him to fall.

¶9. Donald's claim against Triple S is based upon an assertion that Triple S failed to provide a raised catwalk apparatus along the area where the pipes were being lowered. According to Donald and his expert witness, a catwalk would have permitted him to assist the floor hands without encountering the muddy conditions that caused his fall. There was testimony that such catwalks are provided on some occasions during a work over operation; even Donald testified, however, that only thirty to forty percent of work over rigs have such a catwalk as standard equipment. There was ample proof that it is not uncommon for the area around the pipe slide to become wet due to the combination of inclement weather and drainage of liquids from the old piping. There was conflicting testimony in the record as to the condition of this particular site at the time of the alleged accident, which occurred, according to Donald, at 1:30 a.m. There is also conflicting evidence as to what had been placed on the ground around the slide: ground oyster shells, washed gravel, plain gravel or nothing at all.

¶10. Triple S claims that the slip and fall incident never occurred, arguing that its witnesses could not corroborate Donald's testimony as to the incident. The record reflects, however, that Donald reported this incident to his supervisor the following morning. Moreover, Donald saw his physician three or four days later, and surgery was performed within ten days, requiring Donald to leave the job for a period of approximately three months. Donald had experienced back problems some years prior to this incident, but those problems involved a different region of the spine, and different discs. Donald's injury is consistent with his explanation of the accident, and Triple S offers no other explanation as to how Donald received the injury to his back. Triple S claims that even if the incident did take place, it was not responsible. It argues that the ground was in good condition and that catwalks are not normally provided.

¶11. Donald's second alleged injury occurred on July 9, 1990. On that occasion, Donald claims that he was engaged in a jarring operation to free a section of old pipe that could not be removed by normal methods. Donald testified that the procedure involved a series of jerks on the pipe through the use of the throttle, clutch and braking mechanism on the drilling rig in an attempt to shake loose the lodged pipe. He stated that it was important to maintain a balance between applying sufficient sudden force to dislodge old pipe and such excessive force as would strip free the newly-made attachment. Excessive force would likely damage expensive fishing tool equipment and cause the entire well operation to shut down.

¶12. Donald claims that the failure of the rig's braking mechanism, due to improperly maintained brakes, was the cause of his second injury. He stated that he was attempting to apply the brakes when the mechanism failed and the brake lever went all the way to the floor, putting everything attached to the rig in free fall. He testified that by strenuously jerking back on the brake lever he was able to reset the brakes and stop the free fall. He claims, however, that the strenuous jerking motion necessary to reset the malfunctioning brake caused an injury to his neck. Surgery following this incident left him with a permanent twenty-five to thirty percent (25-30%) disability. Testimony by the defendant's expert witness was that Donald could possibly "do some work as a security guard, if such work was available, and it did not involve being on his feet for long periods of time." Normally, the operation of the drilling mechanism is the duty of an individual designated as the driller. Donald testified, however, that it is not uncommon for the fishing tool operator to take over the actual operation of the drilling

mechanism, especially during critical phases of the fishing operation.

¶13. Donald claims that for some time prior to the incident, it had been known that the braking mechanism was in a state of disrepair because the brake bands were warped, causing the brake pads to wear out prematurely. Every person testifying at trial, whether for the plaintiff or the defendant, corroborated Donald's testimony that it was commonly known that there was a problem with the brakes. Donald had asked Randy Quevas to replace the bands. Two days after the accident, the rig was shut down for fourteen hours and the brakes were replaced.

¶14. This second incident was also reported to Donald's supervisor, and followed immediately by surgery. According to Donald's physician and his expert vocational rehabilitation witness, this accident has resulted in a permanent disability, leaving Donald with very limited mobility. He is unable to drive, stand or sit for extended periods of time.

¶15. Triple S claims that the second accident, like the first one, never took place. In the alternative, Triple S alleges that if the accident did take place then Donald assumed the risk of injury because he performed his work knowing the brakes were dangerous. Triple S paid Donald his full salary following the accident in exchange for Donald's workers' compensation checks being signed over to the company.

¶16. None of Triple S's witnesses verified that they had seen the accidents occur. One witness admitted that he was not even at the scene at the time of the alleged incident; another testified that he was sleeping at the time. Donald's supervisor verified that the second accident had been duly reported and written up, although the employer never followed up by questioning anyone at the scene or investigating the accident in any way.

### III.

¶17. The Donalds argue that the trial court erred in overruling their motion in limine concerning Mr. Donald's possible use of alcohol on the job on other occasions, since there was insufficient proof of his use of alcohol on the dates in question to submit that issue to the jury as contributory negligence. The Donalds argue that upon a close jury verdict, this testimony resulted in extreme prejudice.[1]

¶18. Counsel for the Donalds filed a motion in limine seeking to prevent any mention of alcohol consumption by Mr. Donald "unless proof of intoxication is offered through way of direct testimony that there is [sic] any witnesses to said allegations . . . . " Defense counsel argued that such proof was admissible under Miss. R. Evid. 406 in that the intended proof would demonstrate a "habit" of alcohol use on the job sufficient to support a permissible inference by the jury that Donald was using alcohol on the "particular occasion" of his injuries "in conformity with the habit. . . ." *See* Miss. R. Evid. 406. Based on these representations, the trial court denied the motion in limine, but determined that the proof would be limited to evidence of alcohol use on the job.

¶19. There was no testimony at trial that Donald had ever been observed taking a drink; there was ample testimony that he was an excellent fishing tool operator and that he had never been observed acting in an impaired or intoxicated manner on the job. Five witnesses for the defense testified that they smelled alcohol on Donald's breath whenever they were around him. One of the five, Donald Madison, could not identify Donald in the courtroom. Russell Doyle Carroll said he smelled alcohol

on Donald's breath, but did not say how often, and did not establish that he smelled it on more than one occasion. Furthermore, this was the only question asked of Doyle, who was not on site the night of the accident. Wayne Beech testified that he had never seen Donald drink. Despite having worked with him for twelve years, he stated that he had smelled alcohol on Donald's breath only on the last few days before Donald left the job. Randy Quevas stated that he smelled alcohol on Donald more than once in the month preceding the accident. Paul McKean also testified that he had smelled alcohol on Donald, but said, "I don't know what the date was . . . I didn't even know what his name was."

¶20. The record reflects, and the trial court agreed at the conclusion of the trial, that the proof never reached the level of showing intoxication on the job at any time. The trial court refused an instruction requested by Triple S which instructed the jury that if it determined that Donald was under the influence of alcohol on the occasion of his injuries and that his condition was the sole proximate cause of his injuries, then they should return a verdict for Triple S. The lower court ruled:

> Let the record show the court will refuse that instruction as there is no proof in the record that anybody testified to that he was under the influence at any time. That the most of the proof was that they did smell alcohol every time they were around him. And the jury, in the Court's opinion, should just this,[sic] if they believe it, as just part of the facts of this case, but not be instructed that intoxication caused or contributed to the accident to bar the plaintiff in that there is no such proof showing that he was either incapacitated through the use of alcohol or acted in any method or manner inconsistent with the work he was performing.

¶21. The Donalds contend, however, that the continuous interjection of innuendos throughout trial regarding the use of alcohol on the job severely prejudiced their case. In opening argument, counsel for Triple S had stated:

> We're going to have testimony, again from Mr. Griffith as well as Triple S [sic] crew, that Mr. Donald had a habit, a daily habit of consuming hard liquor, probably vodka.

> These are people that worked face to face with him. They took orders from him, verbal orders. You'll hear testimony about his use of alcohol at the work site. It's not Triple S's fault if Mr. Donald has that problem. Please don't hold it against us. We think the proof is going to show that alcohol had a big part in causing these injuries, incidents, if, in fact, they occurred at all.

¶22. This is but one of several misleading statements by defense counsel, both at trial and in Triple S's briefs and response to the petition for writ of certiorari. The "Mr. Griffith" referred to in the defendant's opening argument is Wyatt Magee Griffith, an Apache boss, who worked with Donald continuously for over twelve years. His actual testimony was as follows:

> Q. Now, Mr. Griffith, there's been a lot of testimony about alcohol in this lawsuit. Do you know whether or not Mr. Donald ever drank alcohol on any of the work sites that you worked on with him?

> A. I never saw him.

> Q. Did you ever smell alcohol on his breath?

A. No, I didn't.

Q. Never did. All right, sir.

A. See, he couldn't have and he know it. I'd have to send him to the house if I'd caught him or smelled it.

¶23. In ***Reyes v. Missouri Pac. R.R. Co.***, 589 F.2d 791 (5th Cir. 1979), the Fifth Circuit suggested evidentiary guidelines on the subject of the use of alcohol as habit evidence:

> Although a precise formula cannot be proposed for determining when the behavior may become so consistent as to rise to the level of habit, "adequacy of sampling and uniformity of response" are controlling considerations. Notes of Advisory Committee on Proposed Rules, Fed. R. Evid. 406, 28 U.S.C.A. at p. 153. Thus the probative force of habit evidence to prove intoxication on a given occasion depends on the "degree of regularity of the practice and its coincidence with the occasion. McCormick on Evidence § 195 n.16 (2d ed. 1972).

> We do not undertake here to prescribe the precise quantum of proof necessary to transform a general disposition for excessive drinking into a "habit" of intemperance; we simply find that four prior convictions for public intoxication spanning a three and one-half year period are of insufficient regularity to rise to the level of "habit" evidence. Consequently, we hold the evidence to be inadmissible under Rule 406 as well.

> A principal purpose behind the exclusion of character evidence, as we have said, is the prejudicial effect that it can have on the trier of fact. This concern is especially compelling here where the character evidence relates to one of the critical issues in the case, i.e., the contributory negligence of Reyes. Finding the introduction of the prior convictions to be extremely prejudicial, we feel that the error affected the substantial rights of Reyes, thus requiring a new trial.

***Reyes***, 589 F. 2d at 795 (citations omitted).

¶24. In the present case, the evidence clearly did not establish that Donald had a habit of drinking on the job. Even if the evidence had been admissible under Rule 406, however, it was still subject to the balancing test of Rule 403. *See **Hans Constr. Co., Inc. v. Drummond***, 653 So. 2d 253, 265 (Miss. 1995) (although evidence was admissible under Rule 406, the question remained "whether the information was substantially more prejudicial than probative under Rule 403"). Rule 403 provides: "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . . " Miss. R. Evid. 403; *see also **id.***

¶25. In ***Gustavson v. Gaynor***, 503 A.2d 340 (N.J. Super. Ct. App. Div. 1985), the New Jersey Supreme Court held as follows regarding the admissibility of drinking or evidence of intoxication as it relates to negligent driving:

> In those jurisdictions which have considered this question, the rule followed is that evidence of prior drinking is admissible as being relevant to the issue of the driver's fitness only when there is some supplementary evidence from which the trier of the fact may reasonably conclude that

the drinking affected the safe operation of the vehicle. . .

The mere fact that a driver had consumed some alcoholic beverages is by itself insufficient to warrant an inference that the driver was intoxicated and that the intoxication was of such a degree as to render him unfit to drive at the time of the accident. *The admission of such testimony without supporting evidence is unduly prejudicial in view of its capacity to inflame the jury. . . .* Accordingly, questions cannot be asked which intimate to the jury that a party was intoxicated at the time of the accident unless there is supporting evidence; in the absence of supporting evidence, *testimony concerning the drinking of intoxicants should be stricken, and under certain circumstances, may constitute reversible error notwithstanding a sustained objection.*

*Id.* at 342-43 (emphasis added) (citations omitted).

¶26. The Illinois Appellate Court, in **Wagner v. Zboncak**, 443 N.E. 2d 1085 (Ill. App. Ct. 1982), held the following concerning the admissibility of evidence of drinking:

*Evidence of drinking is so prejudicial that more than mere drinking must be shown;* actual intoxication with impairment of physical or mental capacities is required. . . . *Insinuations or innuendos of intoxication based upon evidence of drinking are impermissible and irrelevant when there is no evidence of intoxication.*

**Wagner**, 443 N.E. 2d at 1087 (emphasis added) (citations omitted). *See also* **Benuska v. Dahl**, 410 N.E. 2d 249, 252 (Ill. App. Ct. 1980) ("[i]t is well established that the subject of drinking may not be raised or examined by a party unless that party can prove actual intoxication"). The evidence of intoxication must reveal actions or conduct which either directly or by reasonable inference established that the individual's conduct at and before the accident was or may have been affected by the use of alcoholic beverages. **Clay v. McCarthy**, 392 N.E. 2d 693, 696 (Ill. App. Ct. 1979); (citing **Shore v. Thurman**, 210 N.E. 2d 232, 236 (Ill. App. Ct. 1965)).

¶27. In the present case, Triple S failed to establish that anyone had ever observed Donald taking a drink or acting in an impaired or intoxicated manner on the job. Nevertheless, innuendo blanketed the entire proceeding. Counsel for the defense made repeated remarks to the jury concerning on-the-job use of alcohol by Donald. Counsel for the Donalds was forced to discuss the matter with every witness in order to refute the allegations of intoxication. This evidence undoubtedly had an impact upon the jury.

¶28. The crucial question is whether the admission of this evidence affected the verdict. In *Allen v. Blanks,* 384 So. 2d 63 (Miss. 1980), the defense attorney made unwarranted innuendos concerning the plaintiff's failure to procure a driver's license for the purpose of showing lack of due care on the part of the plaintiff. In considering whether the error was harmless, this Court stated:

the sharp conflict in the testimony of the witnesses demonstrates the case is factually close on the liability issue, particularly in view of the application of comparative negligence. Under these circumstances, even slight prejudice must be assumed to have been outcome-determinative.

*Allen,* 384 So.2d at 69. *See also* **Glorioso v. Young Mens Christian Ass'n of Jackson,** 556 So. 2d

293, 295 (Miss. 1989).

¶29. As in *Allen,* there was a great deal of conflict in the testimony regarding the ultimate issue of liability. The record reflects, however, that as the result of the lower court's overruling of the Donalds' motion in limine, the issue of alcohol and use of alcohol on the job became one of the main issues in the trial of this matter. Repeated insinuations of alcohol abuse were injected into the case and prevented the Donalds from receiving a fair trial. Triple S failed to show that alcohol affected Donald in any way on the two days that Donald was injured. The testimony never rose to the level required to establish habit evidence. Moreover, Triple S did not assert intoxication as an affirmative defense. The testimony served no legitimate purpose, but only confused and misled the jury.

¶30. The trial court erred in not requiring at least a proffer of testimony by Triple S before it overruled Donald's motion in limine. Testimony of alleged alcohol consumption should not be allowed before the jury without a minimal showing of admissibility or causal connection between the alleged consumption of alcohol and the accidents involving Donald. We cannot say on this record that no prejudice resulted to the Donalds, as the entire proceeding was permeated by innuendos of consumption of alcohol on the job site. No proof was established that this took place, or if it did, that there was any causal connection between the accidents and consumption of alcohol. Rather, the proof showed that nobody had ever seen Donald acting in an impaired manner while performing his duties. Accordingly, we must reverse the judgment.

## IV.

¶31. Defendant Triple S's Instruction D-6, which referred to the first alleged accident in which Donald was involved, read as follows:

> The Court instructs the jury that if you find by a preponderance of the evidence that on August 1, 1989, the date which the Plaintiff claims to have fallen due to the conditions at the Booth well site, that the Plaintiff was aware of such conditions and knew and understood that it would not be safe, or that it would be dangerous to work under the conditions then and there existing, that the Plaintiff deliberately and voluntarily chose to work in those conditions in such a manner as to expose himself to danger or place him in a position inconsistent with his own safety, then, under the law, the Plaintiff assumed the risk involved and if you further find from a preponderance of the evidence that such actions on the Plaintiff's behalf were the sole proximate cause of the injuries, then Plaintiff is entitled to recover nothing on this claim of August 1, 1989.

Defendant's Instruction D-7, referring to the second alleged incident which left Donald permanently disabled, read as follows:

> The court instructs the jury if you find by a preponderance of the evidence on July 9, 1990, the date which the Plaintiff claims to have been injured due to alleged unsafe conditions of the brake on the work over rig, that your Plaintiff was aware of the condition of the brakes and knew and understood that it would not be safe, or that it would be dangerous to work under the conditions that then and there existed, and that the Plaintiff deliberately and voluntarily chose to work with the brakes on the work over despite the condition of the brakes in such manner as to expose himself to danger or place himself in a position inconsistent with his own safety, then

under the law, Plaintiff assumed the risk involved and if you further find from a preponderance of the evidence that such action on the Plaintiff's behalf was the sole proximate cause of the injuries in question, then the Plaintiff is entitled to recover nothing on this claim and, if you so find, it is your sworn duty to return a verdict for the Defendant, Triple S. Well Service, Inc., on the Plaintiff's claim of July 9, 1990.

¶32. The Donalds submit that jury instructions D-6 and D-7 misled the jury and that the verdict based on these instructions combined with other instructions given by the court resulted in "a miscarriage of justice." Triple S requested no jury instructions on contributory negligence. The only instructions granted regarding a defense submitted by Triple S were based on assumption of the risk. The Donalds contend that the trial court, by allowing the assumption of the risk instruction to have been given in conjunction with the comparative negligence instruction offered by them, misled the jury on the law that should have been applied in this case.

¶33. In **Horton v. American Tobacco Co.**, 667 So. 2d 1289 (Miss. 1995), we considered the issue of assumption of the risk instructions. In that case, the jury was given a comparative fault instruction telling the jury that if it found that the plaintiff negligently contributed to his injuries, then it should determine the percentage of each party's fault and render a verdict for the plaintiff deducting the percentage of the plaintiff's fault from any damages sustained. The jury was also given an assumption of the risk instruction telling the jury that if it found that the plaintiff appreciated the risk of using cigarettes and voluntarily used them in violation of that risk, then the jury should find for the defendant tobacco company. **Horton,** 667 So.2d at 1292.

¶34. A majority of this Court concluded that the trial court erred in granting the assumption of the risk instruction. **Id.** at 1289-90. The rationale for this conclusion is that the concept of assumption of the risk is subsumed in our comparative fault doctrine. **Id.** at 1293 (Banks, J., writing for the plurality) and 1305-06 (Lee, P.J., concurring in part and dissenting in part). In other words, assumption of the risk on the part of the plaintiff merely goes to the percentage of fault attributable to the plaintiff; it no longer affords a complete defense to the defendant unless the jury finds that the plaintiff's assumption of risk proportionately reduces damages to zero. **Id.** at 1292. *See also* **Tharp v. Bunge Corp.,** 641 So. 2d 20, 23-25 (Miss. 1994) (where jury finds any negligence on the part of a defendant property owner in allowing a dangerous condition to exist, the "open and obvious" doctrine will not provide complete defense; rather, the doctrine of comparative negligence will determine the recovery, if any, to be had by a negligent plaintiff).

¶35. We note that while the instructions here in question refer to the fact that the plaintiff may have "assumed the risk," they also require the jury to consider and determine whether the plaintiff's action was the *sole* proximate cause of his injuries. Only if the jury so finds is the plaintiff entitled to recover nothing. This requirement is in line with our law of comparative fault.

¶36. We trust that the trial court will be guided by subsequent legal developments regarding assumption of the risk when and if this matter is retried.

### V.

¶37. For the foregoing reasons the judgment of the circuit court is reversed and this matter is remanded to that court for further proceedings.

¶38. **REVERSED AND REMANDED.**

**SULLIVAN AND PITTMAN, P.JJ., CONCUR. PRATHER C.J., CONCURS IN PART. McRAE, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION. MILLS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY ROBERTS AND SMITH, JJ. PRATHER, C.J., JOINS IN PART. WALLER, J., NOT PARTICIPATING.**

### McRAE, JUSTICE, SPECIALLY CONCURRING:

¶39. I agree with the majority's conclusion that the case should be reversed. I write separately, however, to highlight Instructions D-6 and D-7, which served to mislead the jury on the issues of assumption of risk and comparative negligence. As we explained in *Tharp v. Bunge Corp.,* 641 So. 2d 20 (Miss. 1994), where this Court held that the "open and obvious" defense could no longer serve as an absolute bar to recovery under our comparative negligence standard,

> Mississippi led the nation at the turn of this century by being the first state to adopt a pure comparative negligence standard. Mississippi Code Ann. § 11-7-17 (1972) reads that "all questions of negligence and contributory negligence shall be for the jury to determine." Miss. Code Ann. § 11-7-17 (1972). For the open and obvious defense to be a complete bar to a negligence claim, the plaintiff must be one hundred percent (100%) negligent himself. Miss. Code Ann. § 11-7-15 (1972). Mississippi Code Ann. § 11-7-15 states the fact that "the person injured, or the owner of the property ... may have been guilty of contributory negligence shall not bar a recovery, but damages shall be diminished by the jury in proportion to the amount of negligence attributable to the person injured, or the owner of the property...." Miss. Code Ann. § 11-7-15 (1972).

*Tharp,* 641 So. 2d at 23. While the plurality in *Horton v. American Tobacco Co.,* 667 So. 2d 1289 (Miss. 1995) declined to abolish the doctrine of assumption of risk, it did, as today's majority points out, recognize that assumption of risk has been subsumed in our comparative negligence doctrine. Especially in cases such as this, where an employee is compelled to assume whatever risks his duties may hold or otherwise lose his job, he should not be held fully accountable for injuries arising from that employment or the negligence of his own employer in ordering or forcing him to work in such a situation. In other words, when the employer and another are negligent, then there should not be any comparative negligence placed on the employee. Only when the actual negligence of the employee that has been proven should a comparative negligence instruction be given.

¶40. The language of Instruction D-6, further, is too broad. It fails to set out what conditions Donald was aware of and chose to work in despite the risks posed. Especially in light of Instruction D-7, the lack of specificity in Instruction D-6 only made the directions given to the jury more confusing and misleading.

**MILLS, JUSTICE, DISSENTING:**

¶41. The majority goes too far when it concludes that assumption of the risk "... is subsumed in our comparative fault doctrine." (*citing* **Horton v. American Tobacco Co.**, 667 So.2d 1289 (Miss.1995)) . **Horton** lacks clear precedential authority for any rule of law. Additionally, **Tharpe v. Bunge Corp.**, 641 So.2d 20 (Miss.1994) has no application to the facts before us. Assumption of risk is still a viable doctrine in Mississippi. **Braswell v. Economy Supply Co.,** 281 So.2d 669 (Miss.1973). In **Braswell**, Justice Sugg states that:

> We do not abolish the doctrine of assumption of risk, but where assumption of risk overlaps and coincides with contributory negligence the rules of the defense of contributory negligence shall apply. This rule does not prevent a defense on the ground that a plaintiff's injury was caused by his negligence, if his negligence was the *sole* proximate cause of the injury.

**Braswell**, 281 So.2d at 677.

¶42. Furthermore, Miss.Code Ann. § 11-1-63 (Supp.1993) specifically provides that assumption of the risk is valid as a defense in products liability cases. It should remain a valid defense in other negligence cases.

¶43. In the case *sub judice*, the jury received both assumption of risk and comparative negligence instructions. It was the jury's duty to apply the law under the theory they thought best applied to the case. This they did. I would continue to allow juries this option.

¶44. For this reason, I respectfully dissent.

**ROBERTS AND SMITH, JJ., JOIN THIS OPINION. PRATHER, C.J., JOINS IN PART.**

---

1. The jury verdict in this case was 9 to 3.