**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

No. 01-31121

_____

SONIA BOCANEGRA, Etc; ET AL

Plaintiffs**,**

SONIA BOCANEGRA, INDIVIDUALLY AND ON
BEHALF OF  RANULFO BOCANEGRA, JR ESTATE,
ON BEHALF OF RANULFO BOCANEGRA, III, ON
BEHALF OF CARINA BOCANEGRA, ON BEHALF
OF ROBERTO BOCANEGRA, ON BEHALF OF
ROLANDO BOCANEGRA

Plaintiff-Appellant,

versus

VICMAR SERVICES, INC; ET AL

Defendants**,**

BOAKE SANDOZ D/B/A/ SANDOZ
MAINTENANCE SERVICE, CLARENDON
NATIONAL INSURANCE COMPANY, AND
RUSSELL A. SERGENT A/K/A/ RUSSELL
A. SARGENT

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Western District of Louisiana

_____

February 19, 2003

Before EMILIO M. GARZA and CLEMENT, Circuit Judges, and DAVIS[*], District Judge.

LEONARD DAVIS, District Judge:

_____

1

* District Judge of the Eastern District of Texas, sitting by designation.

Sonia Bocanegra appeals a jury's take nothing verdict in her wrongful death and survival action against Appellees Boake Sandoz d/b/a Sandoz Maintenance Services, Clarendon Insurance Company and Russell A. Sargent (collectively "Appellees"). On appeal, Bocanegra challenges the trial court's exclusion of evidence relating to the effect of Russell A. Sargent's use of marijuana on his driving abilities at the time of the accident. For the reasons set forth below, we reverse and remand for a new trial.

## BACKGROUND

Ranulfo Bocanegra, Jr. ("Ranulfo") was fatally injured in the early morning hours of December 10, 1998 when he was struck by an industrial sweeper truck as he stood on a grassy median following another accident on I-10 near Scott, Lafayette Parish, Louisiana. Ranulfo and three others had been traveling as passengers in a van driven by Javier Galvan ("Galvan"). As the van was traveling eastbound on I-10, it collided with an eastbound eighteen-wheeler driven by Moises M. Perez and owned by Vicmar Services, Inc. As a result of this collision, the disabled van came to rest primarily in the left-hand lane, while the eighteen-wheeler stopped in the right hand shoulder further down the highway. Ranulfo and others exited the disabled van seeking safety on the grassy median on the left-hand side of the highway.

Shortly thereafter an industrial sweeper truck driven by Russell A. Sargent ("Sargent") and owned by Boake Sandoz d/b/a Sandoz Maintanence Service approached the accident scene traveling eastbound in the left hand lane. Sargent swerved to the left onto the grassy median to avoid hitting the van, but ran over and fatally injured Ranulfo. When investigating police officer Danny Lieux ("Officer Lieux" or "Lieux") arrived on the scene, he observed Sargent "swaying back and forth" prompting Lieux to ask Sargent whether he had been drinking.

2

Ranulfo's wife, Sonia Bocanegra ("Bocanegra"),[1] filed this wrongful death and survival action on December 9, 1999 against Appellees in the Western District of Louisiana.[2] Prior to the case going to trial, Appellees filed motions in limine seeking to exclude any evidence relating to Sargent's use of marijuana approximately eight hours before the accident, including the testimony of two of Bocanegra's experts, Dr. Michael Evans ("Evans"), a toxicologist, and Steve Irwin ("Irwin"), an accident reconstructionist. Sargent had admitted during his deposition that he had taken five or six "hits" of marijuana around 5:30 or 6:00 p.m. on the evening of December 9, 1998 before reporting to work. The fatal accident occurred approximately eight hours later at 1:46 a.m. on December 10, 1998. Sargent further acknowledged during pre-trial testimony that when he smoked marijuana on December 9, he got "high." Evans' report stated that based upon reasonable scientific probability Sargent's marijuana use less than twelve hours before the accident impaired his perception and reaction time at the time of the accident. Irwin's report stated that "any amount of [reaction] time Mr. Sargent lost due to impairment [from marijuana use] is time that could have been used in evaluating his avoidance options [and that] [t]he loss of that time increased the likelihood and severity of the crash."

Appellees' motions in limine sought to exclude Sargent's testimony concerning his marijuana use, Evans' testimony regarding the effect of the marijuana on Sargent's driving ability, and Irwin's testimony concerning the cause of the accident. Appellees argued that Evans' opinions concerning the effect of marijuana on Sargent's driving ability failed to satisfy the criteria for the admissibility of expert testimony set forth in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). They also argued that the probative value of evidence of marijuana use was outweighed by the

[1]Bocanegra filed suit individually and on behalf of the Estate of Ranulfo Bocanegra, Jr. and their four children.

[2]Bocanegra also filed suit against Vicmar Services, Inc., Moises Perez and Lincoln General Insurance Company concerning the initial collision, but settled with these defendants prior to trial.

danger of unfair prejudice under Federal Rule of Evidence 403.

On August 28, 2001, the trial court conducted an extensive *Daubert* hearing at which the trial judge exhaustively questioned Evans and Appellees' toxicologist, Dr. Joseph Manno ("Manno"). Irwin never testified because the trial court concluded that his testimony would rise or fall on that of Evans. The hearing began in mid-morning and did not end until 6:30 p.m. At the close of the hearing, the trial judge concluded that Evans' testimony failed to satisfy the *Daubert* criteria, and that the probative value of the evidence was substantially outweighed by its prejudicial effect. The trial court excluded Sargent's testimony of his marijuana use prior to the accident, Evans' testimony of the effect of Sargent's marijuana use on his driving ability, and Irwin's testimony concerning the cause of the accident. The case proceeded to trial with the jury returning a take nothing verdict upon which the trial court entered a final take nothing judgment in favor of Appellees. On appeal, Bocanegra argues that the trial court erred in excluding evidence of Sargent's marijuana use and its effect on his driving ability on the night of the accident.

## STANDARD OF REVIEW

The admissibility of expert testimony is reviewed under the abuse of discretion standard. *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 274 (5th Cir. 1998). A trial court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence. *Resolution Trust Corp. v. Bright*, 6 F.3d 336, 340-41 (5th Cir. 1993). If we find an abuse of discretion in admitting or excluding evidence, we next review the error under the harmless error doctrine, affirming the judgment, unless the ruling affected substantial rights of the complaining party. *Great Plains Equip., Inc. v. Koch Gathering Sys., Inc.*, 45 F.3d 962, 967 (5th Cir. 1995).

## ADMISSIBILITY OF EXPERT TESTIMONY

Federal Rule of Evidence 702 provides: "If scientific, technical, or other specialized knowledge

4

will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." This "imposes a special obligation upon a trial judge to 'ensure that any and all scientific testimony . . . is not only relevant, but reliable.'" *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (quoting *Daubert*, 509 U.S. at 589, 113 S.Ct. 2786). The expert testimony must be relevant, not simply in the sense that all testimony must be relevant, Fed. R. Evid. 402, but also in the sense that the expert's proposed opinion would assist the trier of fact to understand or determine a fact in issue. *Daubert*, 509 U.S. at 591-92, 113 S.Ct. 2786. Put differently, Rule 702 "requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Id.* at 592, 113 S.Ct. 2786.

As to reliability, the Supreme Court has provided five, non-exclusive factors to consider when assessing whether a methodology is scientifically reliable. These factors are (1) whether the expert's theory can be or has been tested, (2) whether the theory has been subject to peer review and publication, (3) the known or potential rate of error of a technique or theory when applied, (4) the existence and maintenance of standards and controls, and (5) the degree to which the technique or theory has been generally accepted in the scientific community. *Daubert*, 509 U.S. at 593-94, 113 S.Ct. 2786. The test for determining reliability is flexible and can adapt to the particular circumstances underlying the testimony at issue. *Kumho Tire,* 526 U.S. at 150-51, 119 S.Ct. 1167. The party seeking to have the district court admit expert testimony must demonstrate that the expert's findings and conclusions are reliable, but need not show that the expert's findings and conclusions are correct. *Moore*, 151 F.3d at 276. Thus, the question before the trial court was whether or not Evans' testimony regarding the effect of Sargent's marijuana use on his driving ability on the night of the accident was reliable and relevant under these standards to allow the testimony to go before the jury.

### *Reliability of Methodologies*

In her first issue, Bocanegra argues that the trial court erred in excluding Evans' testimony because the scientific findings underlying Evans' conclusions, *i.e.*, that residual impairment from marijuana use lasts for at least twelve hours after ingestion, have been peer-reviewed and are widely accepted in the field of toxicology.

At the *Daubert* hearing, Evans cited extensive scientific literature showing that impairment of mental and cognitive functions from marijuana use continues to occur for at least twelve hours after the acute "high" has worn off. Jerome A. Yesavage et. al., *Carry-Over Effects of Marijuana Intoxication on Aircraft Pilot Performance: A Preliminary Report,* 142 American Journal of Psychiatry 1325 (1985); Stephen J. Heishman, et. al., *Acute and Residual Effects of Marijuana: Profiles of Plasma THC Levels, Physiological, Subjective and Performance Measures*, 37 Pharmacology, Biochemistry and Behavior 561 (1990). Based on these studies and Sargent's admission that he smoked marijuana within twelve hours of the accident, Evans concluded that Sargent's driving ability, and more specifically his perception and reaction time, was impaired at the time of the accident.

The "Yesavage study" published in the American Journal of Psychiatry has been repeatedly relied upon by courts confronted with issues related to the residual effects of drug use. *See, e.g., Holloman v. Greater Cleveland Regional Transit Authority*, 741 F.Supp. 677, 686 (N.D. Ohio 1990) (citing Yesavage study's conclusion that 24 hours after marijuana use, pilots' mean performance "trends toward impairment" on all variables tested, with "significant impairment" shown in the performance of certain tasks) ; *Fowler v. New York City Dept. of Sanitation*, 704 F.Supp. 1264, 1275 (S.D.N.Y. 1989) (citing the Yesavage study for the proposition that "[s]erious skill impairment has been measured 24 hours after smoking a single marijuana cigarette."); *Amalgamated Transit Union v. Cambria County Transit Authority*, 691 F.Supp. 898, 907 (W.D. Pa. 1988) ("We find more persuasive the conclusion expressed

6

in defendant's deposition exhibit 2: that exhibit reports that citing the Yesavage study's conclusion that twenty-four hours after smoking marijuana . . . pilots showed serio us impairment on flight simulation tests). Indeed, even Appellees' toxicologist, Manno, testified that he considered the Yesavage study to be a valid, peer-reviewed study. Manno also stated that, in his own clinical studies, he has recorded impairment from marijuana twenty-fours hours after it was smoked.

Accordingly, the only possible basis for the trial court's rationale in excluding the evidence of marijuana is the application of the methodologies utilized in the cited studies to the facts of this case. In other words, the trial judge must have concluded that Evans' extrapolation of the methodologies in the studies to this case lacked a "valid scientific connection" to the case before him. The trial court appears to have concluded that Evans' testimony did not pass muster under *Daubert* for essentially two reasons. First, he noted that Evans was unable to point to any causal connection between Sargent's marijuana use and the accident. Second, the trial judge stated that since Evans did not know the quantity or quality of the marijuana Sargent ingested on December 9, Evans could not opine that Sargent was impaired. We now consider each of the trial court's two stated reasons for excluding the evidence at issue.

### *Causal Connection Between the Marijuana and the Accident*

The trial court concluded that before any evidence of Sargent's marijuana use could be presented to the jury there had to be some evidence of a causal connection between the marijuana use and the accident. It is noteworthy that Evans never held himself out to be an expert on accident reconstruction, but only on toxicology, and more specifically the effects of marijuana use on perception and reaction time and driving ability. Irwin, the accident reconstruction expert, who was not questioned by the court, had opined in his report that any impairment in perception reaction time increased the likelihood of the crash. Nevertheless, the trial court relied upon two cases, *Gustavson v. Gaynor*, 503 A.2d 340 (N.J. Super. Ct. App. Div. 1985) and *Donald v. Triple S Well Service, Inc.*, 708 So.2d 1318 (Miss. 1998) to support its

7

conclusion, both of which are distinguishable from the case at hand. Neither *Gustavson* or *Donald* involved a challenge to expert testimony under *Daubert*. Rather, both cases concerned challenges to the admissibility of evidence when the probative value of the evidence was substantially outweighed by its prejudicial effect.

In both *Gustavson* and *Donald*, the issue was whether evidence of prior consumption of alcohol may be admitted without evidence that the individual's conduct was affected by the alcoholic beverage. *Gustavson*, 503 A.2d at 342; *Donald*, 708 So.2d at 1323. Both courts held that without evidence of conduct such as driving at an excessive speed, recklessness or erratic driving, or drunken behavior at the accident scene, evidence of alcohol consumption is "unduly prejudicial in view of its capacity to inflame the jury." *Gustavson*, 503 A.2d at 342; *Donald*, 708 So.2d at 1323. In neither *Gustavson* nor *Donald*, however, did an expert testify that the alcohol consumption in question had any effect on the individual's cognitive functions. Further, even if we were to apply the criteria espoused in *Gustavson* and *Donald* for the admission of evidence of drug use, Bocanegara proffered the testimony of Officer Lieux that when he came upon the scene after the accident, his first impression of Sargent was that Sargent was "swaying back and forth" and that he was "possibly intoxicated." When Lieux asked Sargent whether he had been drinking, Sargent stated he had not. Lieux did not detect the odor of alcohol on Sargent. Lieux did not ask Sargent whether he had smoked marijuana. Thus, Lieux's testimony and Sargent's admission that he got "high" on December 9 provided compelling evidence that Sargent's behavior at the scene of the accident scene was consistent with his admitted marijuana use earlier that evening. In contrast, the *Gustavson* court found that "there was a complete absence of any supplementary evidence of [the driver's] unfitness to drive . . . ." *Id*. at 343.

Here, Evans testified extensively that studies have demonstrated that marijuana use impairs cognitive functions, including those related to the operation of a motor vehicle, for at least twelve hours

8

after the acute "high" wears off. Based on his own testimony, Sargent was within that twelve hour window when the accident occurred. Because of Evans' knowledge and training in the field of toxicology, his testimony would have been helpful to the fact-finder, not because it would have explained the connection between the marijuana and the accident, but because it explained the effect of recent ingestion of marijuana on an individual's cognitive functions, including perception and reaction time, both critical factors in any accident.[3] We do not consider the fact that Evans was unable to point to erratic driving or excessive speed as determinative of whether his testimony was helpful to the jury. Nothing in the record shows that a driver *must* be driving erratically or at an excessive rate of speed to be impaired by marijuana. The critical issue in this case was whether Sargent's reaction time was affected by his ingestion of marijuana. Evans' testimony tends to show that it was. Even Defendants' expert, Manno, expressed reservations about an individual's driving ability after ingesting marijuana. When asked whether he would get in a car as a passenger with a driver who told him that he had taken five or six hits off a joint eight hours before, Manno replied, "Probably not."

Based on the foregoing, we conclude that the trial court erred in finding that Evans' failure to point to a causal connection between Sargent's marijuana use and the accident rendered his testimony unhelpful to the jury. We now turn to the trial court's second reason for excluding Evans' testimony, that

---

[3]A recent decision by a Louisiana intermediate appellate court supports our conclusion. In *Wingfield v. Louisiana*, No. 2001 CA 2668, 2001 CA 2669, 2002 La. App. LEXIS (La. Ct. App. November 8, 2002), the trial court excluded expert testimony that "impairment of the driver from marijuana use was probable and could have contributed to the cause of the accident." *Id*. at *17. The appellate court concluded that the trial court erred in excluding such evidence because "the specific scientific knowledge imparted by the experts would be more probative than prejudicial." *Id*. at *15. The court noted that the *Daubert* guidelines require "'only that the proponent of the evidence show that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion'" and that the possibility of baseless prejudice against marijuana smokers would be addressed by the presentation of evidence from both sides. *Id*. Although the court held that the exclusion of the testimony was error, the court found that the error was harmless. *Id*. at 26. *See also Louisiana v. Richie*, 556 So.2d 651 (La. App. 1990), *rev'd on other grounds*, 590 So.2d 139 (La. 1991) (holding that evidence of a defendant's chronic marijuana use and possession of marijuana in a criminal prosecution for negligent homicide resulting from the defendant's operation of a motorboat was admissible even though there was no evidence that the defendant smoked marijuana the day of the accident).

Evans did not know the quantity or quality of the marijuana ingested by Sargent, and could not therefore opine that he was impaired at the time of the accident.

### *The Quality and Quantity of Marijuana Ingested by Sargent*

We start from the notion that in few, if any, cases involving driver use of marijuana will there ever be specific evidence of the quantity or quality of the marijuana ingested.[4] However, the trial court apparently relied upon some of the literature discussed at the *Daubert* hearing which states that the effects of Delta-9-Tetrahydrocannabinol ("THC"), the major psychoactive chemical in marijuana, on an individual may vary due to differing concentrations of THC in marijuana plants, the physiology of the individual and the quantity of the THC ingested. Evans testified that these variables are mitigated because individuals who smoke marijuana "self-titrate," that is they smoke to get high and then they stop. Evans further testified that he has gleaned this principle from his expertise in working with people who use marijuana. He also testified that the idea that marijuana users "self-titrate" is a commonly held belief in the scientific community and that he was not aware of an instance where a person has smoked marijuana for a reason other than to get high. The record reflects that the trial judge considered Evans' reliance on "self-titration" to be an invalid "assumption," *i.e.,* a conclusion that does not permit Evans to extrapolate the general findings of the cited studies to Sargent's experience on the night of the accident.

Although the trial court concluded that Evans improperly assumed that marijuana smokers "self-titrate," it is important to note that Manno agreed with Evans on many aspects of this issue. Manno acknowledged that Sargent admitted that he took five or six hits off a joint. Manno also testified as follows:

---

[4]Both experts agreed that there is no known "level" or "grade" of marijuana intoxication. Manno testified that once one's high wears off, there are no detectable THC levels in the blood, however, a negative blood test does not rule out impairment. This would make it very difficult, if not impossible, to detect known quantities once one's high has worn off.

Q.	Do you assume that people smoke marijuana to get high?

A.	It depends on what you define as high.  People–different people use marijuana for different effects.  As I don't smoke marijuana and I have never smoked marijuana, so I can only go by what people tell me.  Some people smoke one or two puffs off a marijuana cigarette to get relaxed.  That same individual may be at a party where in a recreational situation they want to be less inhibited and silly and have fun, and they may smoke more marijuana at that time to get intoxicated, a buzz, whatever word they use to describe a high.  And this high is a situation where they have a release of inhibitions, and they can do things they normally would not do.
And then other people use marijuana chronically on a daily basis to escape reality.  They actually consume enough marijuana that they are considered amotivational and don't sustain jobs.  So different people have different use patterns.

Q.	I appreciate that.  You said two things there.  You said something about some people smoke, you said one or two hits to relax or something like that?

A.	That's correct.

Q.	Okay.  He didn't smoke one or two hits by his own admission.  He smoked, he said, five or six; is that correct.

A.	It depends on - - one or two hits means whatever amount they need of marijuana, understanding that people don't go to a store and buy marijuana of two percent and know what they are getting.  They buy street marijuana that has vary ing concentrations.  When they use marijuana they titrate themselves because they get an effect immediately and they choose a level.  If they have very weak marijuana, they'll take ten hits.  If they have very strong marijuana, they'll take one hit.  They will get the same effect either way.
. . . .

Q.	Okay.  Let me ask you the question I asked you a moment ago and also in your deposition.
	"In rendering your conclusions, do you assume that [people] smoke marijuana for the purpose of getting high?"

A.	That's correct.

It is clear from both Evans and Manno's testimony that, as a general principle, individuals smoke marijuana until they achieve a desired effect.  None of the testimony adduced at the *Daubert* hearing shows that the general principle of self-titration would not encompass Sargent's use of marijuana on December 9.  Further, when considered in light of Sargent's admission that he took five or six hits of marijuana, Manno's testimony indicates that Sargent's purpose in ingesting marijuana was not simply to "relax."

While there are certain variables that cannot be known for certain, such as the exact dosage Sargent ingested on December 9, we are not persuaded that these variables alone render Evans' opinions

11

concerning self-titration or his opinions in general unhelpful under *Daubert*. Sargent testified under oath that he took five or six hits of marijuana before going to work, and even that he "got high" on December 9. Evans' testimony concerning the effect marijuana ingestion would have had on Sargent's perception and reaction time as he approached the disabled van would have assisted the trier of fact. The fact that there are variables could have easily been presented to the jury through Appellees' toxicologist. We also note that when discussing these variables, Evans testified that while the degree of effect THC has on an individual may vary, the effects themselves will be the same. Further, Manno testified that an individual who has taken five or six hits off a joint with a known THC content will be "minimally impaired." Manno explained "minimally impaired" as "significant impairment. They increase their weaving ability on the road and things like that." Thus, it would seem undisputed that a person who has taken five or six hits off a marijuana joint will be impaired. It is simply the degree of impairment that is unknown because that is linked to the amount of THC ingested. We see no reason why Appellees could not present evidence concerning the fact that the THC content is unknown to the jury. The unknown specific THC ingested would go to the weight to be given to Evans testimony, not its admissibility.

We are mindful that in the tightly controlled environment of a scientific study scientists are able to eliminate many unknowns. For example, in studies involving any drug, scientists can quantify the dosage ingested by participants in the study, they can know the quality and quantity of the psychoactive component in the drug, and they can, if they desire, determine the relative ability of a participant to absorb a drug. The real world, however, does not operate like a controlled study.

If all variables were required to be eliminated in a case where an actor has used marijuana or another drug and then been involved in an accident, evidence of drug use would never be presented to the fact-finder. Without evidence of Sargent's marijuana use in this case, the evidence presented at trial

bore little resemblance to what actually happened.[5] *Daubert* and its progeny do not compel such a result. *Ruiz-Trouche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 85-86 (1st Cir. 1998) (holding that trial court improperly applied a standard of scientific certainty to testimony that driver was impaired by cocaine). Thus, we hold that the trial court erred in concluding that Evans' reliance on the principle of self-titration rendered his testimony unhelpful to the jury.

For the foregoing reasons, we conclude that the trial court's reliance on *Daubert* to exclude Evans' testimony concerning possible cognitive impairment resulting from Sargent's ingestion of marijuana on December 9 was an abuse of discretion.

## ADMISSIBILITY OF EVANS' OPINIONS UNDER RULE 403

We review a trial court's decision to exclude evidence under Federal Rule of Evidence 403[6] under the abuse of discretion standard. *Caparotta v. Entergy Corp.*, 168 F.3d 754, 758 (5th Cir. 1999). Based on all of the reasons previously stated, we conclude that the trial court reliance on Rule 403 as another basis to exclude Evans' testimony concerning cognitive impairment resulting from Sargent's ingestion of marijuana on December 9 was an abuse of discretion. *See Ballou v. Henri Studios, Inc.* 656 F.2d 1147, 1155-56 (5th Cir. Unit A Sept. 1981) (holding that results of blood alcohol test showing intoxication were erroneously excluded under Rule 403 because evidence of intoxication was highly relevant and prejudice resulting from admission of evidence must be unfair).

## HARM ANALYSIS

---

[5]By our holding we are not concluding that a trial court may never exclude testimony in a drug case or a different type of case based on the fact that unknown variables render the testimony unhelpful to the jury. We are simply holding that in this case, the variables do not undermine the expert's testimony to the point that it is of no assistance to the jury.

[6]Rule 403 provides, in pertinent part:
"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. . . ."

Because the trial court excluded all evidence of Sargent's marijuana use, the jury was not presented with a complete picture of what happened on the night in question. In closing argument, Appellees repeatedly argued that Sargent reacted reasonably and did the best he could under the circumstances. As Bocanegra argues, it is difficult to see how one who smokes marijuana eight hours before driving an industrial vehicle "did the best he could." On the record before us, we conclude that Bocanegra's substantial rights were affected because the jury was prevented from even considering the critical issue of whether Sargent's marijuana use affected his ability to react appropriately to the disabled van in his lane of travel on the night of the accident.

## CONCLUSION

Bocanegra's first issue is sustained. The trial court's judgment is reversed and the cause is remanded for a new trial.[7]

---

[7]Because we have sustained Bocanegra's first issue, we need not address her remaining issues.