# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 8, 2024

Lyle W. Cayce
Clerk

No. 22-40587

Gibson, Incorporated, *a Delaware corporation*,

*Plaintiff—Appellee/Cross-Appellant*,

*versus*

Armadillo Distribution Enterprises, Incorporated, *a Florida corporation*; Concordia Investment Partners, L.L.C.,

*Defendants—Appellants/Cross-Appellees*.

---

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 4:19-CV-358

---

Before Stewart, Clement, and Ho, *Circuit Judges*.
Carl E. Stewart, *Circuit Judge*:

Plaintiff Gibson, Inc. brought trademark-infringement and counterfeiting claims against Defendants Armadillo Distribution Enterprises, Inc. and Concordia Investment Partners, LLC. After a ten-day trial, the jury found in favor of Gibson on several counts of infringement and counterfeiting but also found that the doctrine of laches applied to limit Gibson's recovery of damages. In deciding Gibson's omnibus motion in limine, the district court excluded wholesale decades of third-party-use evidence that Armadillo and Concordia submitted in support of their

genericness defense and counterclaim. Armadillo and Concordia appeal that exclusion order. Because we hold that the district court abused its discretion, we REVERSE and REMAND for a new trial.

## I. Factual Background & Procedural History

### A. Factual Background

A standard modern electric guitar consists of three main parts: the body, neck, and headstock. The body is the largest part of the instrument, and strings run upward from the body, over the neck, and tie into rods on the headstock. The body of an electric guitar has electronic "pickups" that capture and transmit soundwaves and control knobs that further modify the instrument's tonal characteristics. Spaced along the neck at set intervals are "frets," which mark the positions for the player to play the appropriate note by varying the length of the string played. At the end of the neck is the headstock, a block containing the rods that stretch the strings to different tension levels. A player adjusts the pegs protruding from the headstock to alter the guitar's tune. This suit arises from a dispute regarding body and headstock shapes as well as the use of word marks on the guitar headstocks.

#### i. A Brief History of Gibson Guitars

Gibson has produced guitars since the 1800s and in the 1940s produced its first electric guitar, which had a solid body and a headstock in the shape of dove wings. Over the latter half of the twentieth century, Gibson became a larger player in the instrument market, with its growth coming after its introduction of the Flying V and Z-shaped Explorer electric guitars in the 1950s.

In that same decade, Gibson ventured into semi-hollow guitar bodies, releasing its ES-335 design. The body of an ES-335 is symmetrical, with wings similar to Mickey Mouse's ears protruding from each side. In 1960, Gibson introduced the Standard Guitar, or "SG." The SG model offered a slimmer body with horns sticking out from the connection of the guitar's neck and

body. The United States Patent and Trademark Office ("USPTO") issued Gibson trademark registrations for the body shapes, dove-wing headstock, and the "Hummingbird" word mark. As Gibson continued producing electric guitars, a new brand of electric guitars emerged: the so-called "Dean Brand Guitar."

### ii. A Brief History of Dean Brand Guitars

Dean Zelinsky founded Dean Guitars, Inc. in 1976, in Evanston, Illinois. The Dean brand released two guitar models in January 1977, the Dean V and Dean Z. Both models grew in popularity during the 1980s, and popular guitarists from rock bands Kansas, Heart, Def Leppard, and ZZ Top, played on Dean model guitars. In 1991, Zelinsky sold his business to Tropical Music Export Enterprises, Inc., which continued to promote and produce electric guitars under the Dean house mark, including body shapes similar to the Dean V and Dean Z until 1995.

Armadillo then purchased the Dean brand and to date has promoted, manufactured, and sold guitars under the same profile and specifications as the original Dean V and Dean Z guitars released in 1977. Shortly after acquiring the rights to produce Dean guitars, Armadillo began selling Dean-branded guitars, including the Dean V and Dean Z models and a winged headstock.

In 2010, Armadillo introduced its Luna Athena acoustic guitar model, a hollow-body style, similar to Gibson's ES-335. The Luna brand strictly produced acoustic guitars. One of Armadillo's guitars in the Luna line was the "Hummingbird" acoustic guitar. In 2013, Armadillo released its "Gran Sport" model guitar, which—similar to Gibson's SG model—sported a body with horns poking up towards the guitar's neck.

### iii. Gibson's and Armadillo's IP Disputes

Reviewing precisely how this lawsuit was initiated requires turning back the clock to the early 2000s. In 2004, Concordia, as a holding company

for Armadillo, filed a trademark application with the USPTO to register a winged-silhouetted headstock design without any brand name on it. Gibson opposed Concordia's application based on a likelihood of confusion with its own dove-wing headstock, and the Trademark Trial and Appeal Board ("TTAB") heard the dispute. Initially, the TTAB declined to issue Concordia a registered trademark due to similarities in the design of "the undulating curved top of its peg head."

In that same year, the parties drafted an agreement allowing Armadillo and Concordia to license the rights to use Gibson's Flying V and Explorer shapes and requiring Armadillo to secure Gibson's approval for any successor shapes derived from the Dean V and Dean Z. The agreement stipulated that Gibson would drop its opposition to Concordia's headstock registration application and that it would receive royalties in return for the sales of Dean-branded guitars utilizing the Flying V and Explorer shapes. However, the parties did not consummate the agreement, and the dispute languished in the TTAB until 2009. During this period, Armadillo retained Zelinsky, Dean Guitars' founder, as a consultant for its own guitars bearing the Dean brand house mark. The TTAB denied Concordia's application on June 10, 2009, and held that the Dean headstock was likely to cause confusion with Gibson's dove-wing headstock.

In 2015, a Gibson executive received reports from the company's primary trademark-compliance investigator, reigniting the dispute between Gibson and Armadillo. The executives at Gibson averred that they believed the dispute had been settled by agreement years prior. Upon learning that the deal was never finalized, Gibson sought to negotiate a new royalty deal or settlement. These efforts stalled due to Gibson's filing of a voluntary petition for bankruptcy reorganization in May 2018. In November 2018, Gibson emerged from its Chapter 11 proceeding with new executive leadership that

unsuccessfully attempted to reach an agreement with Armadillo and Concordia.

### B. Procedural History

On May 14, 2019, Gibson filed the instant lawsuit against Armadillo and Concordia. It brought Lanham Act and Texas common law claims for willful trademark infringement, willful counterfeiting, false designation of origin, passing off, unjust enrichment, and unfair competition. It alleged that Armadillo infringed on four of its trademarked guitar body shapes, one trademarked guitar headstock shape, and two word marks (collectively, the "Gibson Trademarks"). Gibson asserted a claim for contributory trademark infringement under the Lanham Act against Concordia. It sought damages and a permanent injunction preventing further infringement and counterfeiting of the Gibson Trademarks. At the close of discovery, Armadillo moved for summary judgment, arguing that (1) all of Gibson's claims were barred by the doctrine of laches, (2) Gibson's marks were commercially weak or generic, (3) Armadillo's guitars were always sold with their own branded house marks, (4) Gibson failed to create a genuine dispute of material fact as to the existence of actual confusion between the alleged infringing products and Gibson's products, (5) consumers in the guitar market are accustomed to distinguishing different brands from each other, and (6) Armadillo's and Concordia's use of their own house marks on the allegedly counterfeit products demonstrates that Gibson's counterfeit claims must fail as a matter of law. The district court determined that Armadillo failed to demonstrate "that there is no material issue of fact as to these claims [that] entitled it to judgment as a matter of law."

A few days before trial, the district court made various evidentiary decisions from the parties' motions in limine, including Gibson's omnibus motion in limine. The omnibus motion's sixth motion ("MIL6") sought exclusion of all arguments and evidence relating to "advertisements or sales

of third-party guitars prior to 1992" due to their limited probative value and the risk of unfair prejudice and the presentation of cumulative evidence. Gibson further argued that evidence predating Armadillo's acquisition of the Dean brand in 1997 should be excluded due to hearsay and authentication issues, marginal relevance, and improper foundation. Thus, Gibson asserted that any third-party-use evidence must be restricted to the five-year period preceding Armadillo's and Concordia's acquisition of the rights to produce Dean guitars in 1997.

Armadillo and Concordia opposed MIL6, arguing that evidence of third-party use is highly relevant to genericness and that no legal authority supported a determination that third-party evidence predating a competitor's market entry is irrelevant to evaluating the strength of a mark. The district court partially granted MIL6, limiting Armadillo to evidence of third-party use from 1992 to the present, beginning five years before it acquired the Dean brand from Tropical Music (the "First Exclusion Order"). In its First Exclusion Order, the district court noted that evidence of third-party use—even where the evidence predates the time period at issue in the litigation—is relevant to the inquiry of determining whether a plaintiff's marks are generic or otherwise unprotectable. The district court quoted the Federal Circuit's decision in *Converse, Inc. v. International Trade Commission*, 909 F.3d 1110, 1121 (Fed. Cir. 2018) for the proposition that third-party use "older than five years should only be considered relevant if there is evidence that such uses were likely to have impacted consumers' perceptions of the mark as of the relevant date." Thus, the district court concluded that the probative value of evidence of third-party use before the 1990s was low and that the five-year cutoff date was reasonable.

Armadillo and Concordia objected to the determination, and the district court heard further oral argument as to the third-party-use evidence issue. As a result, the district court issued a Second Exclusion Order that

upheld its MIL6 determination because "concerns regarding judicial efficiency and possible confusion with the jury compel[led]" adherence "to a cut-off date." In Armadillo's formal offer of proof during trial, it referenced the fact that the excluded evidence of third-party use was relevant to the genericness of Gibson's claims.

The parties proceeded to trial on May 16, 2022. At trial, Armadillo moved for judgment as a matter of law before the close of the evidence. The district court denied the motion, concluding that it presented factual issues for the jury to decide. After a ten-day trial, the jury returned a verdict finding that: (1) Armadillo infringed on all of the Gibson Trademarks except for the Flying V word mark, (2) Armadillo marketed counterfeits of the Flying V body shape, the Explorer body shape, the SG body shape, and the "Hummingbird" word mark, (3) Gibson inexcusably delayed asserting its trademark rights in the dove-wing headstock, Flying V body shape, and Explorer body shape, thus barring recovery of damages under the doctrine of laches, (4) Armadillo and Concordia did not act with "unclean hands" in connection with their use of Gibson's marks, (5) Gibson suffered no actual damages from Armadillo's infringement, but was entitled to an award of $4,000 in statutory damages under its Lanham Act counterfeiting claim, (6) none of the Gibson body shapes' marks should be cancelled due to genericness, and (7) Gibson did not tortiously interfere with Armadillo's prospective business relationships. After supplemental briefing and before final judgment, the district court granted a permanent injunction against Armadillo and Concordia prohibiting the sale of the infringing products.

Armadillo and Concordia filed a motion for post-trial relief that offered a renewed motion for judgment as a matter of law and sought relief pursuant to Federal Rules of Civil Procedure 50(b), 59(a), 59(e), and 60(a)–(b). Armadillo and Concordia also moved for a new trial and vacatur of the permanent injunction based on the district court's erroneous granting of

MIL6. They further contended that Gibson's infringement and counterfeiting claims were not cognizable as a matter of law and lacked sufficient evidence to sustain the jury's verdict. The district court denied the motion for post-trial relief in its entirety. Armadillo and Concordia timely appealed.

## II. Standard of Review

"We review rulings on motions in limine for abuse of discretion." *Dial One of the Mid-South, Inc. v. BellSouth Telecomms., Inc.*, 269 F.3d 523, 528 (5th Cir. 2001) (citation omitted). To show an abuse of discretion, the appellant must demonstrate that the district court's evidentiary decision was "based on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir. 2003) (citation omitted). The appellant must also show prejudice from the grant or denial of a motion in limine. *Hesling v. CSX Transp., Inc.*, 396 F.3d 632, 643 (5th Cir. 2005) (citing *Buford v. Howe*, 10 F.3d 1184, 1188 (5th Cir. 1994)). Thus, a ruling that constitutes "an abuse of discretion in admitting or excluding evidence" will be affirmed "under the harmless error doctrine" unless "the [evidentiary] ruling affected substantial rights of the complaining party." *Bocanegra*, 320 F.3d at 584.

## III. Discussion

In addressing a motion in limine, the "trial court must weigh the evidence's contribution to the case against any potential prejudice or confusion." *F.D.I.C. v. Wheat*, 970 F.2d 124, 131 (5th Cir. 1992). Armadillo[1] contends that the district court abused its discretion by excluding decades of third-party-use evidence predating the registration of the Gibson Trademarks. It further asserts that the wholesale exclusion of this evidence

---

[1] Because Armadillo and Concordia jointly prosecute this appeal, the discussion section refers to them collectively as "Armadillo."

was not harmless error because the evidence was central to both Armadillo's counterclaim seeking cancellation of Gibson's marks and its main defense of genericness. For the reasons given below, we agree.

## A. Abuse of Discretion

Third-party-use evidence, or evidence demonstrating an alleged trademark's usage by parties other than the alleged infringer or rightsholder, is often relevant to show the genericness of a mark. *See Springboards to Educ., Inc. v. Houston Indep. Sch. Dist.*, 912 F.3d 805, 815 (5th Cir. 2019) ("Extensive third-party use of a term throughout the market suggests that consumers will not associate the junior mark's use with the senior mark user." (citation omitted)). A mark that is generic is not entitled to trademark protection. *See Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 227 (5th Cir. 2009).

In the proceedings below, the district court excluded wholesale third-party-use evidence central to Armadillo's genericness counterclaim and defense based on Federal Rule of Evidence 403 and *Converse*, 909 F.3d 1110. We examine each of these rationales in turn, beginning with the latter.

### i. Converse

On appeal, Armadillo argues that the district court abused its discretion by relying on *Converse* to exclude third-party-use evidence predating 1992. Armadillo explains that *Converse* is inapposite because that case concerns secondary meaning and not genericness; thus, according to Armadillo, *Converse* cannot support the proposition that only certain temporal evidence is relevant to a genericness defense or counterclaim. In response, Gibson asserts that the district court appropriately relied on *Converse* in making its evidentiary ruling because secondary meaning and

genericness are closely interrelated issues.[2] It further contends, relying on *Converse*, that the five-year period predating the infringement is the "most logical measuring line" because "[c]onsumers are more likely to remember and be impacted in their perceptions by third-party uses within five years and less likely with respect to older uses." Gibson alternatively argues that 15 U.S.C. § 1064 bars Armadillo from introducing pre-1992 third-party-use evidence because Section 1064 provides that a petition to cancel a mark's registration may be filed only "[w]ithin five years from the date of the registration of the mark." We are unconvinced by Gibson's arguments.

In *Converse*, the court did not determine that third-party-use evidence older than five years before the alleged infringer's first use was irrelevant to a genericness analysis. *See* 909 F.3d at 1121. Rather, the Federal Circuit analyzed whether such evidence provides the best evidence to determine whether a mark has attained secondary meaning in the minds of consumers. *See id.* It determined that "[third-party] uses older than five years should only be considered relevant if there is evidence that such uses were likely to have impacted consumers' perceptions of the mark as of the relevant date." *Id.* Notably, the Federal Circuit remanded the case to the International Trade Commission to examine whether "[e]vidence older than th[e] five-year period" was relevant. *Id.* at 1122. With this added context, it is clear that *Converse* does not compel a strict five-year limitation of third-party-use evidence and, if anything, compels trial courts to examine whether older evidence is relevant.

---

[2] The parties' debate about secondary meaning versus genericness is beside the point because, as explained below, *Converse* did not impose any sort of categorical five-year limitation on admissible evidence—regardless of whether that evidence went to genericness or secondary meaning or both—and in fact instructed the lower court to consider whether evidence predating that five-year window is relevant. 909 F.3d at 1121–22.

No. 22-40587

*Converse* is instructive here because there is scant circuit authority addressing the relevance of third-party-use evidence dating back several decades.[3] *Converse* detailed that third-party-use evidence older than five years before the date of infringement is relevant "if there is evidence that such uses were likely to have impacted consumers' perceptions of the mark as of the relevant date." *Id.* at 1121.

On that question, in numerous cases, both inside and outside of the trademark-registration-challenge context, courts[4] and the TTAB have examined third-party-use evidence from decades *prior to* the five-year period before the alleged infringement. *See, e.g.*, *In re Jasmin Larian, LLC*, No. 87522459, 2022 WL 374410, at *7 (T.T.A.B. Jan. 19, 2022) (holding trademark generic where the "Examining Attorney [] presented substantial evidence that third parties have sold, offered for sale, and/or otherwise advertised, discussed or promoted identical or nearly identical handbags

_____

[3] We have never confronted this precise issue of placing temporal limitations on the exclusion of third-party-use evidence based on relevancy to a claim of genericness. *Cf. Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.3d 252, 259–60 (5th Cir. 1980) (examining district court's discounting of decades of third-party uses in likelihood-of-confusion analysis where a mark's distinctiveness was conceded and genericness was not argued at a bench trial).

[4] *Malaco Leaf, AB v. Promotion in Motion, Inc.*, 287 F. Supp. 2d 355, 364–65 (S.D.N.Y. 2003) (holding that decades of unchecked third-party use of product design trade-dress for gummy candy fish was relevant to the genericness of the contested mark); *BellSouth Corp. v. White Directory Publishers, Inc.*, 42 F. Supp. 2d 598, 607–10, 610 n.5 (M.D.N.C. 1999) (determining that thirty years of third-party use of the "walking fingers" rendered the logo "an unprotectible mark"); *see generally Ale House Mgmt., Inc. v. Raleigh Ale House, Inc.*, 205 F.3d 137, 142 (4th Cir. 2000) ("Trade dress should be considered generic if 'well-known' or 'common' . . . or a 'common basic shape or design' . . .") (citation omitted); *Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 1000 (2d Cir. 1997) ("Yet trade dress protection has its limits. A trade dress that consists of the shape of a product that conforms to a well-established industry custom is generic and hence unprotected.").

prior to and concurrently with Applicant's use [beginning on January 27, 2013], *and that consumers have seen identical or nearly identical handbags emanating from parties other than Applicant since at least the 1940s* and recognize Applicant's mark as a common design") (emphasis added); *Stuart Spector Designs Ltd. v. Fender Musical Instruments Corp.*, 94 U.S.P.Q.2d 1549, 2009 WL 1017284, at *8 (T.T.A.B. 2009) (examining evidence of third-party-use of the contested guitar-body shapes dating back several decades).

Here, Armadillo argues that it was "prepared to present ample evidence that older third-party uses of the [body shapes] had affected consumer perceptions as of the date of either Armadillo's first alleged infringement or the dates of the body shapes' respective registrations." In its opposition to MIL6, Armadillo averred that testimony from both experts on both sides of this case would demonstrate how third-party uses from the 1960s to the present "have impacted consumer perceptions of Gibson's [body shapes] over the years such that those shapes are either generic or, at a minimum, incredibly weak."

Armadillo thus provided—or was prepared to provide—evidence that third-party uses of the body shapes prior to the five-year period fashioned in this case were relevant to the genericness inquiry. The district court did not even consider the relevance of the pre-1992 evidence in light of this showing. So, to the extent that its reliance on *Converse* would be appropriate, the district court misapplied it by not giving Armadillo the opportunity to demonstrate relevance. We conclude that the district court erred by excluding wholesale, without proper consideration or explanation, all pre-1992 third-party-use evidence. *See Bocanegra*, 320 F.3d at 584.

Gibson's interpretation of Sections 1064(1) and (3) does not save the district court's evidentiary ruling. Gibson argues that Armadillo is barred by statute from even arguing pre-1992 genericness at this point. Under Gibson's reading of the relevant statute, once five years have passed from a mark's

registration, a challenging party loses any opportunity to argue that the mark was generic *before* registration and, going forward, may argue only that the registered mark has *become* generic since registration. It is true that Section 1064 of the Lanham Act freely allows cancellation actions brought within five years of registration but limits the options for a party seeking such relief after that window passes. *See* 15 U.S.C. § 1064. But Gibson's construction conflicts with other provisions of the statute—namely, Section 1065(4), which provides that "no incontestable right shall be acquired in a mark which is the generic name for the goods or services or a portion thereof, for which it is registered." 15 U.S.C. § 1065(4). This provision notes no sort of time limitation for bringing a claim that a party's mark became generic before registration. To the contrary, we have held that "if it is determined that the mark is generic, it can *never* become incontestable." *Texas Pig Stands, Inc. v. Hard Rock Café Int'l, Inc.*, 951 F.2d 684, 689 n.5 (5th Cir. 1992) (emphasis added). Thus, the Lanham Act allows for a petition filed more than five years after registration to cancel a trademark on the theory that the mark was generic *prior* to registration. Reading these provisions together demonstrates that Section 1064 does not stretch so far as to *per se* bar third-party-use evidence predating five years before the first alleged infringing use. Because the district court excluded wholesale the pre-1992 evidence without examining the possible relevance of that evidence, it abused its discretion.

### ii. Rule 403

In its Second Exclusion Order, the district court referenced Rule 403 as a basis for the wholesale exclusion. Rule 403 provides that "[t]he court may exclude relevant evidence if its probative value is *substantially outweighed* by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403 (emphasis added). In MIL6, Gibson sought the wholesale exclusion of third-party-use evidence

prior to 1992 on the grounds that the admission of such evidence would disserve judicial economy. The district court agreed. It reasoned that "concerns regarding judicial efficiency and possible confusion with the jury compel[led]" adherence "to a cut-off date."

We hold that this determination is inconsistent not only with the district court's previous holdings in this case addressing Armadillo's genericness defense but also with the principle that exclusion of probative evidence under Rule 403 is "an extraordinary remedy that must be used sparingly." *Herrington v. Hiller*, 883 F.2d 411, 414 (5th Cir. 1989) (citation omitted). Such a sweeping use of Rule 403 conflicts with the principle that pretrial motions seeking the wholesale exclusion of a class of relevant evidence require careful review. *See Kelly v. Boeing Petroleum Servs.*, 61 F.3d 350, 357 & n.7 (5th Cir. 1995); *Jackson v. Firestone Tire & Rubber Co.*, 788 F.2d 1070, 1084 (5th Cir. 1986). While Rule 403 requires a district court to balance the proffered evidence with the risk of countervailing concerns, it provides no basis for the complete exclusion of all third-party-use evidence prior to 1992. Doing so caused substantial prejudice to Armadillo as the party seeking admission of third-party-use evidence critical to its primary defense. The district court determined that Armadillo's third-party-use evidence was highly relevant at several points during discovery. For instance, it denied a *Daubert* motion to exclude Appellant's music history expert because it determined that his "opinion aids the jury by providing insight into Gibson's trademarks and *relevant third-party usage of similar guitar shapes*." Thus, we hold that the district court abused its discretion in excluding wholesale all third-party-use evidence predating 1992.

### B. Harmless Error

As noted above, an abuse of discretion in an evidentiary ruling will not be overturned absent a showing of substantial prejudice resulting from that determination. *See Hesling*, 396 F.3d at 643. In *Bocanegra v. Vicmar Services,*

*Inc.*, a pedestrian was fatally injured when he was struck by a streetsweeper on the median of a highway. 320 F.3d at 583. On the eve of trial, the pedestrian's estate sought to introduce evidence demonstrating that the driver of the streetsweeper was impaired by the use of marijuana a few hours prior to the fatal collision. *Id.* Citing Rule 403 and the *Daubert* standard, the district court granted the driver's motion in limine and excluded the driver's expert testimony and an admission from the driver that he had smoked marijuana a few hours before the incident. *Id.* at 583–84. The jury returned a take-nothing verdict, and the pedestrian's estate appealed. *Id.* On appeal, this court determined that the district court's "reliance on Rule 403 as another basis to exclude [the relevant expert] testimony concerning cognitive impairment resulting from [the driver's] ingestion of marijuana" constituted an abuse of discretion. *Id.* at 590. This court further held that the error affected the pedestrian's substantial rights because "the jury was not presented with a complete picture of what happened on the night in question." *Id.* This court concluded that the pedestrian's estate was left with no means of countering the driver's argument that he "reacted reasonably and did the best he could under the circumstances." *Id.*

Just as in *Bocanegra*, the jury in this case "was not presented with a complete picture of what happened" prior to the alleged period of infringement and heard little to no evidence supporting Armadillo's theory that the Gibson Trademarks were generic at the time of their registration. *See id.* Thus, it is apparent that the wholesale exclusion of all pre-1992 third-party-use evidence affected Armadillo's substantial rights. At several periods in this litigation, the district court agreed that third-party-use evidence is highly relevant to the genericness analysis and the likelihood of confusion factors. For instance, the district court previously held that "third-party sales data are at the core of Armadillo's argument that Gibson's marks are generic" and that such evidence "is therefore necessary to Armadillo's

defense." The trial court also acknowledged that Fifth Circuit precedent says "that evidence of the state of the market, even where that evidence 'predates' the time period relevant to the litigation, is relevant to whether the marks have become generic." In granting MIL6 pursuant to Rule 403, the district court contradicted its prior evaluations of the evidence with only a few lines of text in its Second Exclusion Order.

Armadillo's genericness claim is central to its case because "[g]eneric marks . . . are categorically excluded from [trademark] protection." *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 241–42 (5th Cir. 2010). Put another way, Gibson would not sustain actual or statutory damages if Armadillo were to prevail on its genericness counterclaim.[5] In its offer of proof at trial, Armadillo consistently reiterated that the excluded evidence was relevant to its genericness defense and counterclaim. This claim cannot be divorced from the rest of the issues on appeal, and the appropriate remedy to this evidentiary error is to order a new trial. *See Brooks v. Great Lakes Dredge-Dock Co.*, 754 F.2d 539, 540 (5th Cir. 1985) ("Courts must order a complete retrial of issues 'unless it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice." (quoting *Gasoline Prods. v. Champlin Ref.*, 283 U.S. 494, 500 (1931)). We conclude that the district court's abuse of discretion affected Armadillo's substantial rights to put on its primary defense to the infringement and counterfeiting claims against it, and thus, a new trial must occur. *See id.*

---

[5] Armadillo also raised the equitable defense of laches. This court has determined that "a finding of laches alone" may limit the availability of injunctive relief for a trademark-infringement claim. *See Conan Props., Inc. v. Conans Pizza, Inc.*, 752 F.2d 145, 152 (5th Cir. 1985). From this, it can be said that Armadillo's primary defense was genericness, and that the district court's partial granting of MIL6 severely limited Armadillo's ability to support its main theory of the case.

## IV. Conclusion

In sum, we hold that the district court abused its discretion in excluding wholesale all pre-1992 evidence of third-party use of the Gibson Trademarks pursuant to Rule 403. Rule 403's ambit does not contemplate broad, case-dispositive exclusions that severely restrict a party's ability to advance its primary defense to a cause of action. Thus, we REVERSE and REMAND with instructions to hold a new trial.